IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD M. HERDER,             :
                              :
    Plaintiff                 :
                              :   CIVIL NO. 1:CV-09-2470
    vs.                       :
                              :   (Judge Caldwell)
MR. BIESH, *et al.*,          :
                              :
    Defendants                :

*M E M O R A N D U M*

I.  *Introduction*

The pro se plaintiff, Ronald M. Herder, an inmate at SCI-Huntingdon, Huntingdon, Pennsylvania, has filed two nearly identical motions for injunctive relief, seeking a transfer to another prison and a complete medical work up by a team of specialists.[1] Both motions (and the complaint) are based on the following claims: the denial of proper medical treatment for a spinal injury after a weightlifting machine fell on Plaintiff; poisoning by the medical staff by giving him an unknown "concoction" of a white powdery substance which damaged his heart and kidneys in retaliation for complaining of his inadequate medical care; and staff interference with his ability to exhaust his administrative remedies related to these events due to threats of physical harm and/or parole complications. *See* Docs. 8 and 22.

---

[1] This is the only relief he seeks in his complaint.

Plaintiff asserts that staff are denying him the appropriate care for these ailments and that they erroneously diagnosed him with an anxiety disorder as a ruse to poison or kill him. He contends he will suffer from permanent neurological and cardiac damage as well as continue to endure verbal and physical threats from staff without court intervention.

For the reasons stated below, both motions will be denied.

II.  *Standard of Review*

A court issues a preliminary injunction in a lawsuit to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits. *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir. 1994). "A preliminary injunction is an extraordinary remedy that is never awarded as of right." *Winter v. Natural Res. Def. Council*, __ U.S. __, __, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008); *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

In order to obtain preliminary injunctive relief pursuant to Fed. R. Civ. P. 65, the requesting party must show: (1) a likelihood of success on the merits; (2) irreparable harm resulting from the denial of relief; (3) granting the injunction will not result in irreparable harm to the non-moving party; and (4) granting the injunction is in the public interest. *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 556 (3d Cir. 2009)(citing *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356-57 (3d Cir. 2007)). Preliminary relief requires a showing of *likely* irreparable injury. *Winter,* __ U.S. at __, 129 S.Ct. at 375 (emphasis in original). In other words, "'a preliminary injunction

will not be issued simply to prevent the possibility of some remote future harm.'" *Id.* (quoted case omitted).

III. *Discussion*

Plaintiff is presenting Eighth Amendment claims. In opposing the motions, the medical defendants argue that he has failed to show a substantial likelihood of success on those claims or that he will suffer irreparable harm if his request for injunctive relief is not granted. The court agrees.

A violation of the Eighth Amendment requires a showing of "deliberate indifference" to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). Specifically, an inmate must show that: (1) the prison officials had subjective knowledge of a risk of serious harm; and (2) the prison officials disregarded that risk. *Id.* at 834-35, 114 S.Ct. 1977-78. Deliberate indifference can be shown by a prison official "intentionally denying or delaying access to medical care or intentionally interfering with [medical] treatment once prescribed," *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), or by "persist[ing in] conduct in the face of resultant pain and the risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990). Thus, allegations that a physician or medical-department staff member "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. . . ." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Similarly, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." *Id.*,

429 U.S. at 107, 97 S.Ct. at 293. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990). In sum, negligence, unsuccessful medical treatment, or an inmate's disagreement with his medical treatment is insufficient to establish deliberate indifference. *See Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993).

The record reveals the following. On May 11, 2009, a weight machine fell on Herder's back. (Doc. 8, Herder Decl. ¶ 1). He was placed on "lay in" status for one week and given a lower bunk status for two weeks. He was also provided Flexeril and Naproxen for two weeks. (Doc. 16-2, Shoaf Decl. ¶ 4). A few days later Herder's cervical spine was x-rayed, and the results were within normal limits. *Id.* A week later a CT scan of Herder's cervical spine was performed at J.C. Blair Hospital on May 23, 2009, and showed a minor rotation of the neck. (Doc. 24, CM/ECF p. 8[2] and Shoaf Decl. ¶ 5). On June 2, 2009, Herder was placed in bottom bunk and later that week was given a forty-eight-hour "lay in." (*Id.* ¶ 6).

The following week a lumbar spine x-ray was taken and was within normal limits. The next day Herder's right hip was x-rayed and was found to be within normal limits. (*Id.* ¶ 7). On June 30, 2009, July 7, 2009, and July 22, 2009, daily blood pressure checks were ordered over a course of several days to address complaints of elevated blood pressure. (*Id.* ¶ 8). No hypertensive abnormalities were identified. *Id.* According to

---

[2] Unless otherwise noted, all citations to the record reflect the docket number and page number assigned by the electronic case filing system (CM/ECF) rather than the page numbers of the original documents.

Herder, at some point in June 2009 he was temporarily transferred from SCI-Huntingdon to SCI-Smithfield, "where he was given the necessary medical care." (Herder Decl. ¶ 17).

On July 5, 2009, Herder ingested what he originally believed to be Benadryl, but now suspects was poison. (Doc. 1, Compl. at CM/ECF p. 14). A few minutes after taking the white powdery substance, his heart began to race and he became nauseated. He was taken to the infirmary where a nurse performed two EKGs, but eventually he was sent back to his cell without seeing a physician. (*Id.* at p. 7). On July 8, 2009 he was given a "work up." *Id.* Herder states he "was seen by the medical dept . . . all through out the month of July."[3] (*Id.* at p. 10).

Multiple EKGs were performed on Herder between July 14, 2009, and September 12, 2009, and were all normal. (Shoaf Decl. ¶ 9). Plaintiff's August 14, 2009, blood work was within normal limits. Several urinalysis and a stool culture were performed in the fall of 2009 and were normal. (*Id.* ¶ 11). As of December 17, 2009, Herder's eyes were checked and found to be normal, with his vision being slightly less than perfect. (*Id.* ¶ 12).

On October 28, 2009, a holter monitor was utilized to assess Herder's cardiac complaints. (*Id.* ¶ 13). His average heart rate was 63. Some tachycardia was noted, which it was noted may require further investigation, but Dr. Shoaf did not feel it was a sign of a serious condition at that time. (*Id.*). A chest x-ray was taken the same day and

---

[3] Herder also states that he "was at medical 2-3 times a day for the next 4 months at which time [he] was better able to breathe and walk (due to the "psych" medication [he] was being given." (Doc. 36, Herder's Reply to his Second Mot. for TRO and Injunction, CM/ECF at p. 11).

showed cardiac size within normal limits and that Plaintiff's lungs were clear without disease. (*Id.* ¶ 14).

In November 2009, medical staff referred Herder to the psychiatric department several times to assess his panic attacks. (*Id.* ¶ 15). Herder was seen for a physical exam on December 5, 2009, and no problems were detected. (*Id.* ¶ 16). A January 21, 2010, EKG was normal. (*Id.* ¶ 17).

Aside from the above-described tests and evaluations, Herder has also been prescribed the following medication to address his complaints of pain and discomfort: Motrin, Metamucil, Colase, Zantac, Benadryl, Tylenol, Flexeril, Naproxen, and Prednisone. (*Id.* ¶ 18). He also receives psychotropic medications such as Buspar and is occasionally non-compliant with them. (*Id.* ¶ 19).

Herder's failure to take his psychotropic medications as prescribed can lead to the conditions he has complained about, such as elevated heart rate and panic attacks. *Id.* Herder admits that at times he:

> was refusing all medication because [he] was thinking [defendants] might try to finish [him] off. Finally [he] could take the constant ches[t] pain no more . . . [He] felt safe enough to try the medicine the Medical Unit had offered through the [psych] Department. After about a week the medication makes [his] heart beat more like normal again. On a few occasions [he] tried to discontinue the medication but about two days after stopping the medication [his] heart begins to beat very irregularly and causes a great deal of pain.

(Doc. 36, CM/ECF pp. 11-12).

Without much elaboration, it is clear that Herder has received medical treatment, despite his claims that medical treatment has been withheld for his May 11,

-6-

2009, injury, and that he was poisoned by medical staff on July 5, 2009. Herder's own recitations of medical treatment, often collaborating the declaration of Dr. Shoaf, demonstrates that he has received a plethora of medical attention for his medical complaints, and that medical care was, and continues to be, available to him to address ongoing or new complaints. While Herder may not have received a neck brace, or cane, or other self-selected form of treatment for his May 2009 injuries, it is indisputable that he received some immediate medical attention for the injury, and thorough imaging of the various structural parts of his body that may have been impacted by the injury. Clearly his complaints of discomfort did not fall on deaf ears and were addressed.[4]

Further, Herder concedes that, when he takes it, his psychotropic medication alleviates many of his cardiac symptoms. By his own admission, when he does not take it, he has episodes of tachycardia and chest discomfort, which are then relieved when he resumes taking the medication. This admission flies in the face of his assertion that SCI-Huntingdon medical staff are prescribing psychotropic medication to make him "think" he suffers from anxiety, and not from an underlying medical condition, which the numerous blood, urine, stool, x-ray, EKG and physical examinations have yet to uncover. Under the conditions presented, there is no evidence that Herder's health will be irreparably harmed without a court-mandated medical evaluation at a different facility. In sum, absent a showing of likely irreparable injury, regardless of Herder's ability to state an Eighth Amendment claim, or ultimate ability to make a showing on the merits of such a claim,

---

[4] We note that at this point, Herder has been seen by SCI-Huntingdon, SCI-Smithfield and an outside hospital staff for the May 2009 weight-machine injury.

-7-

granting preliminary relief under the facts currently before the court would be inappropriate. *See Winter,* __ U.S. at __, 129 S.Ct. at 375.

To the extent that Herder claims he has been poisoned by defendants in retaliation for his attempt to grieve the May 2009 weight-machine incident, his claim for injunctive relief fails for want of evidence of irreparable harm. Herder claims the poison he ingested has caused an enlarged heart, palpitations, and kidney failure. The record is clear that these ailments have been, and continue to be, addressed by SCI-Huntingdon's medical staff without any evidence to suggest there was a poisoning.

As for his claim that Lt. Lechner "threatened to kill [him] and or let [him] die if [he] continued the grievance process ... or [that he] would not make parole if [he] filed a lawsuit," (doc. 1, Compl., CM/ECF p. 1), at this point, these allegations are nothing more than verbal threats.[5] Based on these statements alone, Plaintiff has not shown that he has a substantial likelihood of prevailing on the merits. Verbal harassment, standing alone, does not rise to the level of a constitutional violation. *See Johnson v. Glick*, 481 F.2d 1028, 1033 n.7 (2d Cir. 1973). Even harassment that includes threats of violence is not a violation of civil rights. *See MacLean v. Secor*, 876 F. Supp. 695, 698-99 (E.D. Pa. 1995)(collecting cases); *Wright v. O'Hara*, 2002 WL 1870479 at *3 (E.D. Pa.). Further,

---

[5] Herder's description of his exchange with Lt. Lechner is found in other locations throughout the record. The Court takes note of the following recitations of the same event: (1) Lt. "Lechner then stated that he believed his officer over me, and asked me what we are going to [do] about this grievance on my officer. I then asked him what he wanted from me. He said don't file any more grievances and don't file a lawsuit." (Doc. 1, Compl. CM/ECF at p. 13); (2) Plaintiff was "requested by Lieutenant Lechner ... to discontinue his grievance process and not to file suit." (Doc. 8, CM/ECF at p. 6).

Herder has not demonstrated how Lt. Lechner's statements, which occurred in 2009, place his life in imminent danger today, warranting injunctive relief.

Finally, the Court cannot grant injunctive relief based on the actions of non-defendants. Those actions are: (1) CO Yocum's July 2, 2009, alleged attempt to poison him (doc. 25, CM/ECF at p. 4); (2) CO Miller's July 17, 2009, action of "pin[ing] [him] against the wall and scream[ing], 'I thought you were a man, your (sic) not a man; I hope you die right now. I hope you have a heart attack right now and die'" (*id.* at CM/ECF p. 6); (3) Mr. Walter's claim that he "could schedule [Herder] to be put in a [psych] hospital . . . and . . . that they were all getting tired of [him] (*id.* at CM/ECF p. 8); and (4) Lt. Haze's 2009 statement that he "better go home" (doc. 1, CM/ECF p. 14). Herder's claims of harassment, by defendants and non-defendants, that occurred in 2009, do not demonstrate the likelihood of irreparable injury requiring the issuance of a preliminary injunction.

We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: July 13, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD M. HERDER, :
:
    Plaintiff :
: CIVIL NO. 1:CV-09-2470
  vs. :
: (Judge Caldwell)
MR. BIESH, *et al.*, :
:
    Defendants :

*O R D E R*

AND NOW, this 13th day of July, 2010, for the reasons set forth in the accompanying Memorandum, it is ordered that Plaintiff's Motions for Preliminary Injunction (doc. 8 and 22) are denied.

                                             /s/William W. Caldwell
                                             William W. Caldwell
                                             United States District Judge